1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )   Nos. 12 CR 723-1
                                    )        13 CR 703
4                  Plaintiff,       )        15 CR 487
                                    )
5             v.                    )   Chicago, Illinois
                                    )   May 6, 2019
6  ADEL DAOUD,                       )   2:15 p.m.
                                    )        Continued
7                  Defendant.       )   Sentencing Hearing

8                     VOLUME 4
             TRANSCRIPT OF PROCEEDINGS
9   BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

10  APPEARANCES:

11  For the Government:     HON. JOHN R. LAUSCH, JR.
                          United States Attorney, by
12                         MR. BARRY JONAS
                          MS. TIFFANY ARDAM,
13                         Assistant United States Attorneys
                          219 South Dearborn Street
14                         Suite 500
                          Chicago, Illinois  60604
15
   For the Defendant:     DURKIN & ROBERTS
16                         2446 North Clark Street
                          Chicago, Illinois  60614
17                         BY:  MR. THOMAS A. DURKIN

18                         LAW OFFICE OF JOSHUA G. HERMAN
                          53 West Jackson Boulevard
19                         Suite 1650
                          Chicago, Illinois  60604
20                         BY:  MR. JOSHUA G. HERMAN

21  U.S. PROBATION:        MS. KELLY KWONG

22

23           TRACEY DANA McCULLOUGH, CSR, RPR
                 Official Court Reporter
24              219 South Dearborn Street
                       Room 1426
25             Chicago, Illinois  60604
                    (312) 435-5570

1          THE CLERK:  12 CR 723, 13 CR 703, and 15 CR 487, USA

2  versus Adel Daoud.

3          MR. JONAS:  Good afternoon, Your Honor.  Barry Jonas

4  and Tiffany Ardam for the United States.

5          MR. DURKIN:  Good afternoon, Judge.  Tom Durkin and

6  Joshua Herman on behalf of the defendant, who's present.  And

7  as you know, Miss Lyon is in France.

8          THE COURT:  How are you, Mr. Daoud?

9          DEFENDANT DAOUD:  I'm okay.  How are you?

10          THE COURT:  All right.  Good.

11          MS. KWONG:  Good afternoon, Your Honor.  Kelly Kwong

12  on behalf of the Probation Office.

13          THE COURT:  Thank you very much.  Miss Kwong, you and

14  everyone can be seated.  I've got the mike on as I got the look

15  from my court reporter.  Thank you.  All right.  I'm assuming

16  everybody has the phones off before we get started.

17          All right.  I am faced with the difficult and

18  unenviable task of fashioning a sentence in this case that is

19  sufficient but not greater than necessary in this case of U.S.

20  versus Adel Daoud.  And that's all three cases.  These are not

21  run of the mill cases or a run of the mill defendant.  Not that

22  this Court treats any of the defendants before me as run of the

23  mill.  This Court also is not oblivious to the fact that this

24  sentencing is occurring during Ramadan.  It's also occurring

25  during mental health month, and both of these events have

1    relevance to these proceedings.

2            Adel Daoud has been on my criminal case list since

3    2012.  In November of 2018 he entered guilty pleas pursuant to

4    North Carolina versus Alford in cases 12 CR 723, 13 CR 703, and

5    15 CR 487.  To reach a sentencing decision in all of these

6    cases, this Court has reviewed the entire dockets of all three

7    cases.  In particular, the indictments in all three cases, the

8    motions and briefs regarding competency, and transcripts and

9    expert testimony pertaining thereto, Daoud's letters to this

10   Court at dockets 200, 206, and 207, the Alford plea motion and

11   briefing, and subsequent hearing.

12           The motions for additional discovery and in camera

13   review of documents, the presentence investigation report and

14   its attachments, Probation's sentencing recommendation.  The

15   sentencing memoranda from the government, which was about 55

16   pages.  The sentencing memoranda from defendant, which was 122

17   pages.  The testimony and exhibits presented during the

18   three-day sentencing hearing last week, the numerous video and

19   taped discs provided by the government, including the video of

20   the Victim A in case 15 CR 487, and the live testimony

21   regarding the undercover employee who testified, also referred

22   to as Mujahid I think.  Is that correct?  Muja something.

23           MR. JONAS:  Mudaffer.

24           THE COURT:  Oh, I'm sorry.  Okay.  Mudaffer.  Who

25   testified in court regarding the attempt to solicit a hit on

1    him in 13 CR 703.  The letters presented by Daoud's family, in

2    addition to his father's in court testimony, the video disc

3    presented by the defense with character testimony from Mr.

4    Daoud's teachers and religious leader, the case law relied on

5    by the parties, including over the weekend additional

6    supplemental case law and responses.  Thank you very much.  As

7    if I didn't have enough, but I appreciate it.

8            What this Court is not relying on in this case is

9    some of the hyperbole and the hysteria that saturates some of

10   the presentations by counsel for both sides.  And frankly, in

11   everything that has surrounded this case.  There's some brief

12   examples of this on the initial page on the sentencing

13   memoranda of each side, so that everyone can understand what

14   I'm dealing with.  Beginning with the government's page 1,

15   there's a quote, The initial charge was the defendant attempted

16   to detonate a 1,000 pound car bomb that he believed was going

17   to kill hundreds of people who were enjoying a warm evening at

18   the Cactus Bar & Grill.

19           Prior to that evening, the defendant had been

20   preaching for violent Jihad.  Defendant voraciously consumed

21   jihadist material.  The government provided an opportunity to

22   see if he was serious, which defendant jumped at.  That was the

23   first page of the government's sentencing memo.

24           Then there's the defense.  The government set up an

25   elaborate sting on a mentally unstable, immature, naive, and

1   religiously misguided young man.  In the binary world of our

2   ubiquitous national security state, stumbling across a

3   17-year-old in Hillside talking religious nonsense over the

4   internet with a certifiably mentally unstable Polish youth in

5   2012.  Something had to be done for fear there was a terrorist

6   loose in our community.  And something certainly was done.

7   With the government opting for the dire conclusion of terrorism

8   rather than a lesser alternative, such as mental health

9   treatment.

10          Both sides have been operating at this fever pitch on

11  this case for almost the entirety of its time in front of me.

12  This sentence hopes to address both the safety of individuals,

13  the general public, and the future of a young man who has been

14  in custody his entire adulthood.  And thus, with the reasoning

15  provided by both the guidelines as well as the sentencing

16  factors provided under 3553 (a), the federal sentencing

17  statutes, this Court is going to proceed.

18          Without failure the first factor that I always look

19  at in any criminal case is that of the nature and circumstances

20  of the offense that the defendant has been convicted of.

21  Again, we have three cases here.  In the 12 CR 723 convictions

22  Adel Daoud pled guilty to attempting to detonate a 1,000 pound

23  explosive device that was built for and provided by the FBI.

24  The attempted violence upon the Cactus Bar & Grill was thwarted

25  because the bomb was fake.  The seriousness of this offense

1    cannot be understated or downplayed.

2          The attempt was a violent and heinous act to kill or

3    harm others.  And such an attempt clearly deserves the

4    possibility of a prolonged sentence, including life in prison.

5          In the 13 CR 703 case, the defendant pled guilty to

6    soliciting the murder of the UCE who befriended him and made

7    plans to conduct a terrorist bomb attack ultimately using the

8    fake bomb.  Law enforcement's purpose is to protect the public

9    from harm on a daily basis.  Any attempt to harm the law

10   enforcement personnel for doing the job they swore to do must

11   be addressed with serious consequences.

12         In his plea of guilty to the charges in the case of

13   15 CR 487 that was related to his assault of a fellow inmate at

14   the MCC, the harm caused to the inmate was serious and violent.

15   So this Court need not rely on salacious terms to find the

16   crimes the defendant has pled guilty to are all serious and

17   deserve serious sentences.

18         But under 3553 (a) 1 the Court also considers the

19   history and characteristics of the defendant.  There is no

20   dispute that Adel Daoud's first contact with legal authorities

21   at any time was the 2012 arrest.  There is no dispute that Mr.

22   Daoud was an awkward young man with few friends, which is why

23   he wished to graduate early and attend school away from home.

24   Based on the testimony from both the UCE, the transcripts and

25   tapes and their interactions, the testimony of the father,

1   teachers, and Mr. Daoud's interaction with this Court during

2   the time he's been with the Court, there is little doubt that

3   objectively Daoud was an immature young man at 18.  17 actually

4   when the investigation started, who giggled constantly at a

5   high pitch at times and even when talking fast about serious

6   matters.

7           He wanted to talk about politics and religion with a

8   friend online or eventually one much older than himself.  And

9   he was immediately drawn to this agent as someone who valued

10  his religious and political opinions and comments.  He

11  continually did what teenage boys do, and that is to talk big

12  or in quotes "wolf."  Speak about attention getting topics and

13  throw out ideas such as flying cars as the weapon of choice in

14  carrying out violent Jihad.  The Court does not understand how

15  the government really relied on an article about a flying car

16  from the 1950s to prove its claim that defendant 18 at the time

17  he did this, was somehow looking at that as anything other than

18  bravado.

19          But at no time during the pendency of this case has

20  there been any reference to Daoud's use of language no more

21  vulgar than fudge or mother cracker.  The defense makes a good

22  argument in stating that the agent presented the massive bomb

23  to defendant instead of a different type of plot or smaller

24  bomb or some other method of supporting Jihad.  Through this

25  time the defendant is giggling, making silly comparisons at

1  times.  Saying that anybody other than the UCE would think he
2  was crazy.

3       He constantly refers to his parents and his concern
4  for disobeying them.  He refers to doing something within his
5  very small capabilities or doing it with assistance.  Quote,
6  "Cause if I get caught, my parents will go like, they'll flip
7  over, man.  They'll be like Sonic, the Hedgehog, man."  Asking
8  the directions of religious leaders, but wanting the approval
9  of his friend the UCE.

10      He clearly stated that he did not know how to build a
11  bomb.  One second.

12      (Brief pause.)

13      THE COURT:  He did not know how to build a bomb.  He
14  drove around looking like a Ninja Warrior.  He showed himself
15  to be passionate about his religion and would appear to do
16  anything with his whole heart.  Despite his teenage goofiness,
17  the oddities in the transcripts and the nonsensical comments
18  that I've just referred to, and there are many more, but these
19  do not equal a finding that in 2012 the defendant was mentally
20  ill.  Clearly he believed he was detonating a bomb that would
21  cause human deaths and injuries and would put him in a place of
22  favor with the Prophet Muhammad, Allah himself, or his
23  religion.

24      The defense can't have it both ways.  To have a
25  smart, well mannered son who helps his family and his teachers,

1  yet someone who is so unbalanced that the UCE and prosecutors

2  should have known immediately that his mental state was at

3  issue while trying to be protective of any harm from a

4  potential terrorist.  This Court will not speculate on whether

5  the investigators should have had more contact with Daoud's

6  father.  Monday morning quarterbacking is always easier than

7  making a decision on the field.

8         As to the mental state and the solicitation of murder

9  of the UCE, that's the 2013 case, the arguments presented point

10  to the first time arrestee in prison being placed with the

11  likes of Paschal or Pasqual, a high ranking multi-convicted

12  gangbanger.  Daoud was small -- who was small in stature and

13  was threatened and called names that did not obscure their

14  vulgar meaning.  Recordings show that Paschal threatened to

15  kick Daoud's F'g, and this wasn't fudge, ass.  Referred to

16  Daoud as a homosexual as if it was a negative description.

17         He said, quote, "Yeah, but you don't want to drink or

18  have sex because you're a homosexual," unquote.  And there were

19  pages of this kind of talk.  And including a description that

20  Daoud in Paschal's opinion was all the way fuck crazy.  You

21  need to be in an institution.  Defendant admits, though, to

22  following through on some of the steps directed by Paschal that

23  support his conviction and a sentence for deterrence.

24         As despicable as Paschal is, the need to foster

25  respect for law enforcement is an important goal.  Light

500

1   sentences for any attempt to interfere with their ability to

2   serve is putting them at risk.  Naivete cannot be an excuse for

3   proactively trying to take someone's life even if your attempt

4   is not realistic.  Cellmate banter should not outweigh the

5   seriousness of threats on the lives of law enforcement.

6           Now, prior to the assault incident on his fellow

7   inmate, Victim A, Daoud had been restrictive -- had been in

8   restrictive confinement for more than one year.  His first

9   interaction with Victim A was when Victim A drew a picture of

10  Muhammad and made fun of Daoud, which Victim A admitted to

11  doing.  Daoud attacked Victim A with his fists at that time.

12  Five months later Daoud attacked Victim A with -- out of his

13  sleep with sharpened toothbrushes, causing bloody cuts and

14  gouges to the victim's head and neck.

15          Although Victim A said that the Daoud seemed zoned

16  out during the attack or said that he was sorry -- or someone

17  else did, or said that he was sorry at least once, Daoud's

18  inability to control himself where someone is not physically

19  attacking him deserves punishment.  The Court gives very little

20  credence, though, to Victim A's statement that he is, quote,

21  afraid that Daoud will seek him out when he gets out because

22  Victim A has to register as a sex offender and then Daoud would

23  be able to find him, unquote.

24          Anytime people are housed in close proximity with

25  people who may have criminal backgrounds, mental health

1    problems, or frustrations simply at being charged with

2    offenses, physical altercations are bound to occur.  But

3    sentences should be serious enough to discourage such activity.

4         As to the other factors such as deterrence, all the

5    charged conduct needs sentences that discourage the public from

6    participating in any one of these behaviors.  The specific

7    deterrence of Daoud must be included.  Although his

8    allocution -- through his allocution and his parents' testimony

9    and letters and letters of his sister, Daoud seems generally

10   contrite at causing his family so much pain.  And the Court

11   does not think he would want to do it again or risk doing that

12   again to cause them the pain that they have shown throughout

13   this.

14        It seems with medication he has understood the

15   seriousness of the situation he faces.  As long as he has

16   medication and counseling, the Court does hope that he will not

17   reoffend in this manner.  The Court also believes his aging

18   from being a teenager, a brand new adult to the age he is now

19   of 25 has also helped with this, and will continue to do so.

20   But the public must be protected.  The possibility that Daoud

21   could be co-opted or persuaded again is one that cannot be

22   ignored.  At least not at this time.

23        Again, the Court hopes between maturity and

24   medication in the custody of the Bureau of Prisons, that the

25   Court believes that the public can be protected from a

1    situation that this time or at any other time might cause real

2    destruction.

3           The defendant has mentioned college goals and the

4    reason why he'd like to get out as soon as possible to go to

5    college.  The college goals of the defendant are laudable.

6    Access to college courses is available in most institutions,

7    and Daoud should take advantage of those.  The mental health

8    treatment of psychotropic drugs and counseling is necessary

9    according to the defense as well as prosecution experts for the

10   continued improvement and stability of Daoud.

11          Contrary to the government's claim at times and

12   argument both written and oral, those claims of no mental

13   illness for the defendant are not borne out by the examinations

14   and indeed the subsequent improvement that he has made.  His

15   older brother suffers from serious mental illness diagnosis.

16   When you look at the fact that this young person again was held

17   in custody for seven years -- for his first seven years of

18   adulthood, it is without question traumatizing.

19          You add to that the more than 400 days in a special

20   housing unit with the longest sting being a continuous 229

21   days, witnessing his cellie's suicide, which certainly all of

22   this must be taken into consideration for mitigation.  Daoud

23   has with the exception of outbursts and letters about the

24   Illuminati, lizard people, and the Court and her staff being

25   responsible for his cellie's death during a very traumatizing

1   time in his seven-year stint in front of this Court, he has

2   been respectful and pleasant to this Court at all times.  More

3   so than probably any defendant in custody I have had.

4        His family has constantly been in court in support of

5   him even when they have been ill.  He has not had time in his

6   life for me to consider his employment opportunities.  He was

7   arrested at 18.  His teachers, who have been the only ones

8   outside of his family really to observe him outside of these

9   incidents, his teachers have spoken highly of his pleasant

10  personality.  Also spoken about the care -- his care for

11  children younger than him both in school and in his family.

12       This Court cannot and does not consider the Alford

13  plea that he made in November a failure to take responsibility.

14  In fact, through the plea on the eve of trial and his

15  allocution this Court finds that Mr. Daoud has taken

16  responsibility.

17       The parties have cited many cases here in support of

18  their sentencing recommendations.  But the Court, first of all,

19  distinguishes all of them on one very important point that the

20  Court is going to rely on, and that is the lengthy detention

21  that Daoud has endured before we even got to that point.  When

22  you couple that lengthy detention with I believe based on every

23  case I read, him being the youngest at 18 to even be put in

24  this position, those cases are different.  The recent cases

25  cited have ranged from the 10 years that was just -- I was just

1    informed of that recently happened in New York.  Up to I
2    believe 40 years.  Maybe some more.  But I'm talking about the
3    recent cases.

4            As the government has argued that this terrorism act,
5    joined by the solicitation and assault cases in this case is
6    one course of conduct, the Court will continue to consider it
7    so even though they came at different times and must receive
8    different sentences.  But the Court does not see one case being
9    aggravating of the other case.

10           This Court appreciates the lawyers' diligent efforts
11   on this case for their respective sides, and the unparalleled
12   assistance by Miss Kwong and the U.S. Probation Department must
13   be acknowledged.  This Court relies on all the resources and
14   evidence previously stated, the statutory guidelines, the
15   sentencing factors those stated and not stated in this
16   sentencing.  A sentence sufficient but not greater than
17   necessary has the Court come to the conclusion that as to case
18   12 CR 723, that the Court is going to sentence Mr. Adel Daoud
19   to 192 months concurrent on Counts 1 and 2.

20           As to docket No. 13 CR 703, the Court is going to do
21   that concurrent to the 192, and Counts 1 and 2 will be 120
22   months.  And Count 3 on 13 CR 703 will be 140 months.  All to
23   run concurrent with the initial case.

24           As to docket No. 15 CR 487, as to Counts 1, 2, and 3,
25   there will be 120 months to run concurrent.  And as to Count 4,

1  60 months; and Count 5, 12 months.  All of these terms again

2  will run concurrently, and depending on -- and from their

3  indictment date.

4  There will be no fine.  There will be -- there is no

5  restitution involved in this.  There is a total of $925 in

6  special assessments when you count up all the charges.

7  As to the supervised release, the supervised release

8  based on again the Court's review of the sentencing factors is

9  going to be for a total of 45 years.  That's on Counts 1 and 2

10  of 12 CR 723.  As to docket No. 13 CR 703, it will be as -- up

11  to -- as to Counts 1 and 2, it will be three years.  As to

12  Count 3, it will be five years to run concurrent with 12 CR

13  723.  As to docket No. 15 CR 487, the Court levies three years

14  on Counts 1 through 4 of supervised release.  And Count 5, one

15  year supervised release.  Again, all to run concurrent.

16  The supervised release as I stated has been -- has

17  conditions.  Mr. Daoud, because you are very young, because you

18  have spent time in, which it will be expected that you get time

19  considered served for, that because of your age, you will be

20  out.  And you do -- will move to supervised release.  And as to

21  supervised release, again, there are conditions that you must

22  comply with.  Do you understand?

23  DEFENDANT DAOUD:  Yes.

24  THE COURT:  All right.  And the Court is going to go

25  through these as quickly as possible, but that does not mean

1  that they would not require any other -- any less

2  consideration.  There are various groupings under mandatory

3  conditions, discretionary conditions, and special conditions.

4  And for you, though, every consideration is mandatory.  Do you

5  understand?

6          DEFENDANT DAOUD:  I didn't hear what you said.

7          THE COURT:  I'm sorry.  You were talking -- I know.

8  Mr. Herman, can we wait?  All right.  Or you can show that --

9  your calculations to him right now, and I'll take a minute.

10          MR. HERMAN:  We'll wait, Your Honor.

11          THE COURT:  All right.  Okay.  So, first of all, sir,

12  the Court is going to make sure that my order includes, because

13  it takes a few months to be designated, correct, Miss Kwong?

14          MS. KWONG:  Yes, Your Honor.  At least six to eight

15  weeks.

16          THE COURT:  All right.  And so since it takes that

17  kind of time, what the Court wants to make sure is, first of

18  all, that whatever institution BOP designates you for has the

19  required mental health facilities to help you stay on a path of

20  improvement.  Do you understand?

21          DEFENDANT DAOUD:  Yes.

22          THE COURT:  Now, your lawyers may at the close of

23  this say, oh, Judge, we have one specifically.  But I can't

24  guarantee that.  I can only recommend that.  Do you understand?

25          DEFENDANT DAOUD:  Yes.

1           THE COURT:  All right.  And so the Court wants to
2   make sure that not only are you designated to the appropriate
3   one, but then that the Court has an opportunity when you are
4   released, before you are released to make sure that all
5   situations -- released from jail, that all situations that you
6   need are in place so that there is no break in your treatment,
7   that you are in the best possible shape.  When you are
8   eventually fully released, that everything will be in place.
9   And so the Court's just going to have you come back to me.
10  We'll designate a date on our status in, how many months did we
11  say, Miss Kwong?  Three?
12          MS. KWONG:  Three months, Your Honor.
13          THE COURT:  We'll set a three-month status date, and
14  we'll get everything in place.  Because again, the plan is for
15  you to get out and for you to be successful getting out.  Do
16  you understand?
17          DEFENDANT DAOUD:  Yes.
18          THE COURT:  All right.  So there's no confusion,
19  particularly for the parents, again, there's one time that's in
20  custody.  The 45 years goes to being out of custody.  Do you
21  understand?  Do you understand?
22          MR. A. DAOUD:  (Nodding).
23          MS. M. DAOUD:  (Nodding).
24          THE COURT:  All right.  So as far as the supervised
25  release, mandatory conditions are first that you will not

508

1  commit any other federal, state, or local crime.  You will not
2  possess any controlled substance, which would also be a
3  federal, state, or local crime.  You will cooperate with the
4  collection of a DNA sample if the collection is required by
5  law.  Those are the requirements for the mandatory conditions,
6  and you cannot violate any of those.  Do you understand?
7          DEFENDANT DAOUD:  Yes.
8          THE COURT:  All right.  And is there any objection
9  from the government or defense on that?
10         MR. JONAS:  No, Your Honor.
11         MR. DURKIN:  No, Judge.
12         THE COURT:  Thank you.  As to discretionary
13 conditions of supervised released, again, it says
14 discretionary.  But that's not for you to use your discretion.
15 Do you understand?  That is just the label, the way it's set
16 out.  So I know you're an avid reader.  If you see the word
17 discretion on your form, you cannot say, oh, that means I get a
18 choice.  No, you don't get a choice.  Now, if you want to
19 follow up and ask questions of your probation officer or your
20 lawyers, you should do that.  But you have to do that.  Do you
21 understand?
22         DEFENDANT DAOUD:  Yes.
23         THE COURT:  All right.  And the Court has reviewed
24 these in accordance with the sentencing factors.  No. 4 of that
25 discretionary conditions you will seek work and -- you shall

1    seek and work conscientiously at lawful employment or pursue a

2    course of study or vocational training that will help equip you

3    for a job, for employment.  Do you understand?

4              DEFENDANT DAOUD:  Yes.

5              THE COURT:  You will refrain from knowingly meeting

6    or communicating with any persons from whom you know to be

7    engaged or planning to be engaged in criminal activity.  And,

8    in fact, you will -- if you did not know that person was

9    thinking about criminal activity and you find out, you

10   disengage.  Do you understand?

11             DEFENDANT DAOUD:  Yes, ma'am.

12             THE COURT:  All right.  You will not knowingly meet

13   with or communicate with any persons who are or claim to be

14   associated with a foreign terrorist organization as defined

15   under the statute, or who are or claim to be involved with

16   violent acts or advocating for acts of violence, and

17   communicating with any persons who are located outside of the

18   United States with the exception of your family members and

19   persons previously identified and approved by Probation.  Do

20   you understand?

21             DEFENDANT DAOUD:  Yes, ma'am.

22             THE COURT:  You will refrain from excessive use of

23   alcohol, which I -- why is this on here?  I don't expect that.

24   Do you, sir?

25             DEFENDANT DAOUD:  No.

```
1              THE COURT:  Yes, I don't.  So I am myself taking
2    No. 7 off.  Is there any objection?  Government?
3              MR. JONAS:  No, Your Honor.
4              THE COURT:  Any objection, defense?
5              MR. HERMAN:  No, Judge.
6              THE COURT:  You will refrain from possessing any
7    firearm, destructive device, or any other dangerous weapon.
8    And that would include ones you make.  Do you understand that?
9              DEFENDANT DAOUD:  Yes.
10             THE COURT:  You will participate in -- at the
11   direction of probation officer in a mental health treatment
12   program after -- again, you will have updated assessments or at
13   least updated mental health reports from your treatment while
14   you're in custody.  And those will continue even while you're
15   on supervised release.  Do you understand that?
16             DEFENDANT DAOUD:  Yes.
17             THE COURT:  As long as a professional recommends it
18   and says it's necessary.  Do you understand?
19             DEFENDANT DAOUD:  Yes.
20             THE COURT:  You will refrain -- No. 14, you will
21   refrain from leaving the jurisdiction where you are being
22   supervised unless you're granted permission by the Court.  Do
23   you understand?
24             DEFENDANT DAOUD:  Yes.
25             THE COURT:  Or Probation Office.  The areas, again,
```

1  geographic area of the Northern District of Illinois consists

2  of the Illinois counties of Cook, DuPage, Grundy, Kane,

3  Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo

4  Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and

5  Winnebago.  Just don't leave the Northern District of Illinois.

6  Do you understand?

7            DEFENDANT DAOUD:  Yes.

8            THE COURT:  You will report to the probation officer

9  as directed by the Court or Probation.  And since you're going

10  to meet up with the Court again prior to your release, then the

11  Court is going to make sure that we know what that schedule is

12  at least at the outset.  Do you understand?

13            DEFENDANT DAOUD:  Yes.

14            THE COURT:  Probation will be allowed to visit you at

15  any time.  At home, at work, at school, at a community service

16  location.  The only place that the Court is not going to allow

17  them inside is a place of worship.  Do you understand?

18            DEFENDANT DAOUD:  Yes.

19            THE COURT:  All right.  But they can talk to you

20  outside the place of worship, and you must make arrangements.

21  Do you understand?

22            DEFENDANT DAOUD:  Yes, ma'am.

23            THE COURT:  You will not -- you will allow them to

24  confiscate any contraband observed in plain view of the

25  probation officer.  Do you know what contraband is?

512

1      DEFENDANT DAOUD:  Things you're not supposed to have.

2      THE COURT:  There you go.  Things you're not supposed

3  to have.  That's correct.  You will notify Probation promptly

4  within 72 hours of any change in your residence, in your

5  employment -- employer or your workplace.  And absent any

6  constitutional or legal privileges, you will answer questions

7  from your probation officer.

8      You will notify the probation officer promptly within

9  72 hours if you are questioned by anyone from law enforcement.

10  Any type of questioning.  Even if they ask you directions even

11  though they have GPS, you have to tell Probation.  Do you

12  understand?

13      DEFENDANT DAOUD:  Yes, ma'am.

14      THE COURT:  All right.  And also, I'm assuming we

15  didn't change this yet, am I correct?

16      THE CLERK:  No, we have not changed it yet.

17      THE COURT:  They haven't changed it yet.  One second.

18  In addition to letting Probation know if you have contact with

19  law enforcement, if you're arrested or questioned, but you also

20  cannot agree to be an informant, assist the law enforcement,

21  again, without get letting who know?  Probation.

22      DEFENDANT DAOUD:  Probation.

23      THE COURT:  Right.  And who else should you let know?

24  Your lawyers?

25      DEFENDANT DAOUD:  Right.

1     THE COURT:  That will be a good idea.  All right.

2 You will also, sir, submit yourself, your property, your house,

3 anywhere that you are living or regularly staying at in some

4 way, your vehicle if you have one, any papers, electronic

5 communications, or any other type of media to be submitted to a

6 search conducted by the U.S. Probation Office if they have a

7 reason to do so.  Do you understand that?

8     DEFENDANT DAOUD:  Yes, ma'am.

9     THE COURT:  You can object if you want, but I would

10 have somebody there because you're supposed to submit unless

11 the Court stops it.  Do you understand?

12     DEFENDANT DAOUD:  Yes.

13     THE COURT:  Do you understand all the conditions that

14 I have just stated?

15     DEFENDANT DAOUD:  Yes.

16     THE COURT:  All right.  And is there any objection to

17 any of the slight adjustments that the Court may have made at

18 this point, government?

19     MR. JONAS:  No, Your Honor.

20     THE COURT:  Any from defense?

21     MR. DURKIN:  No, Judge.

22     THE COURT:  The last set of conditions is called

23 special conditions of supervised release, sir.  And again, you

24 will be participating in an approved job skills training

25 program at the direction of the Probation Office for the first

1    60 days that you're placed on supervised release unless you're

2    in school or you have a job immediately.  Do you understand?

3              DEFENDANT DAOUD:  Yes.

4              THE COURT:  You also understand, sir, that if

5    Probation requests of you any financial information to monitor

6    that you've been compliant, make sure you've paid off your

7    special assessment, you will complete that.  Do you understand?

8              DEFENDANT DAOUD:  Yes.

9              THE COURT:  And you will comply with their request.

10   Do you understand?

11             DEFENDANT DAOUD:  Yes.

12             THE COURT:  All right.  I already did 11, Miss Kwong.

13             MS. KWONG:  Yes, Your Honor.

14             THE COURT:  All right.  No. 14 in special sections,

15   it is special to this case that you should attend violent

16   extremism counseling from providers as directed by probation

17   officer.  Do you understand?

18             DEFENDANT DAOUD:  Yes, ma'am.

19             THE COURT:  And you will also authorize that any

20   mental health records or from the counseling, the violent

21   extremism counseling be available to the probation officer if

22   they request it.  Do you understand?

23             DEFENDANT DAOUD:  Yes, ma'am.

24             THE COURT:  You will not possess or use any location

25   to store additional storage devices without the approval of

1   Probation.  Do you understand?

2                  DEFENDANT DAOUD:  Yes, ma'am.

3                  THE COURT:  You will comply with the requirements of

4   the computer and internet monitoring program as administered by

5   U.S. Probation.  You will identify all computers to which you

6   have access.  You shall consent to the installation of computer

7   monitoring software on all computers on which you have access.

8   The software may restrict and/or record any and all activities

9   on your computer, including capture of keystrokes, application

10  information, internet use history, e-mail correspondence, chat

11  conversations, and whatever else they'll come up with in the

12  next year or two.  Do you understand?

13                 DEFENDANT DAOUD:  Yes.

14                 THE COURT:  Others will be warned of the existence of

15  the monitoring software that you are using, and you cannot

16  remove, tamper with, or try to reverse engineer or any way try

17  to get around the software.  Do you understand that?

18                 DEFENDANT DAOUD:  Yes.

19                 THE COURT:  The costs of monitoring shall be paid by

20  you at the monthly contractual rate only if you're financially

21  able.  Do you understand?

22                 DEFENDANT DAOUD:  Yes.

23                 THE COURT:  You will be required to submit to

24  periodic polygraph testing at the direction of Probation Office

25  as a means to ensure that you are in compliance with these

1    requirements.  Do you understand?

2            DEFENDANT DAOUD:  Yes.

3            THE COURT:  And again, there's one more condition,

4    again, which is dealing with access to online computer services

5    at any location without prior approval of Probation.  Do you

6    understand?

7            DEFENDANT DAOUD:  Yes.

8            THE COURT:  So basically Probation gets to know

9    beforehand all of the computer access and the technology use

10   that you're having before you can use it.  So it's not to say

11   you can't.  What it's to say is that you have to have

12   permission.  They have to know what you're doing.  Do you

13   understand?

14           DEFENDANT DAOUD:  Yes, ma'am.

15           THE COURT:  Is there any objections to this from the

16   government?

17           MR. JONAS:  No, Your Honor.

18           THE COURT:  Defense?

19           MR. DURKIN:  No, Judge.

20           THE COURT:  Are there any other conditions that as

21   far as you know, Miss Kwong, I have missed or not included?

22           MS. KWONG:  No, Your Honor.

23           THE COURT:  Is there anything else that the

24   government feels under the sentencing factors that this Court

25   should be including here that has not been included?

1          MR. JONAS:  No, Your Honor.

2          THE COURT:  And the same thing for the defense.  Is

3    there any other factors that you believe should be included

4    that this -- I mean, any other conditions that you believe the

5    Court should have included under the factors?

6          MR. DURKIN:  No, Judge.

7          THE COURT:  Thank you.  So we're almost at the end of

8    this.  And so he's already in custody.  We've already said it's

9    going to take approximately six to eight weeks to have him

10   designated.  Is there somewhere you want him designated?

11         MR. DURKIN:  Can I have a second, Judge.

12         THE COURT:  Sure.  And then other than -- while you

13   all are talking, Mr. Jonas, other than appeal rights, is there

14   anything else?

15         MR. JONAS:  Just one thing, Your Honor.  With regard

16   to the conditions of supervised release, were those done as a

17   result of your review of the 3553 (a) factors that you've

18   already discussed?

19         THE COURT:  Yes, they have.  Yes, they are.  That was

20   what I was asking.

21         MR. DURKIN:  I'm sorry.  I didn't hear.

22         THE COURT:  He wanted to know if, even though I said

23   it I think at each -- each incident, each section I said with

24   3553 (a).  So I said it in general at the beginning, and then

25   after each one I believe and for objections, but it's better

1   safe than sorry on this count.  I'm sure there's plenty other

2   stuff that, that can be reviewed.  So he wanted to make sure

3   that I considered 3553 (a) at all points.

4            MR. DURKIN:  We thought that was implicit and

5   explicit in your ruling.

6            THE COURT:  Well, just being safe.  All right.

7   Correct, Mr. Jonas?

8            MR. JONAS:  Yes, Your Honor, just being safe.

9            THE COURT:  Other than that, anything else?

10           MR. JONAS:  No, Your Honor.

11           THE COURT:  All right.  And --

12           MR. DURKIN:  The only thing I wanted to say when we

13  were discussing the special condition regarding the countering

14  violent extremism, and Miss Kwong can correct me if I'm wrong,

15  but I think the record should reflect that it's the hope of

16  Probation and I trust the Court, and certainly our hope that

17  the countering violent extremism program that we, that we were

18  told is in the process of being instituted nationwide will be

19  in place while -- before he is released.

20           THE COURT:  Is released.

21           MR. DURKIN:  Which we think is very valuable, and I

22  think that should be part of the record that it's -- the record

23  shouldn't be silent in the sense that it doesn't exist today,

24  but I believe it's the intention of the government that it's

25  going to exist.

```
 1              THE COURT:  All right.  And, Mr. Jonas, do you have
 2    anything to add to that other than that that's your
 3    information, but you can't guarantee anything?
 4              MR. JONAS:  Correct, Your Honor.
 5              THE COURT:  All right.  The Court -- it sounds like
 6    it is a good program that not only Mr. Daoud but other young
 7    people who might end up being in his position might be able to
 8    benefit from.
 9              MR. DURKIN:  Can we have a minute on the institution?
10              THE COURT:  Yes.
11         (Brief pause.)
12              MR. HERMAN:  Judge --
13              THE COURT:  Mr. Herman.
14              MR. HERMAN:  -- in terms of a recommendation.
15              THE COURT:  Yes.
16              MR. HERMAN:  And this is what I was sliding over to
17    Mr. Daoud, and I didn't mean to cause an interruption.
18              THE COURT:  No.
19              MR. HERMAN:  We believe that Pekins' a care level two
20    facility, and that would be our primary recommendation because
21    of for that reason and the proximity to Chicago or the suburbs
22    for his family.  However, if it's possible to have a second
23    recommendation, and we know that they're just recommendations,
24    it would be to Butner.
25              THE COURT:  All right.  All right.  Well, the Court
```

520

1  did -- that is not unexpected and understood.  And the Court
2  will make those recommendations.  Did you get those, Miss
3  Kwong?

4          MS. KWONG:  Yes, Your Honor.

5          THE COURT:  All right.  Good.  All right.  So, Mr.
6  Daoud, you want to stand up.  Mr. Daoud, you've heard the
7  sentence.  You stated that you understand it.  You have a right
8  to appeal this Court's decision, and you have 14 days in which
9  to file a notice of appeal.  Your very able counsel can advise
10  you further on whatever path you choose to take on appellate
11  rights.  Okay.  You understand?

12          DEFENDANT DAOUD:  Yes, ma'am.

13          THE COURT:  All right.  And you understand what
14  appeal is, right?

15          DEFENDANT DAOUD:  Yes.

16          THE COURT:  All right.  I thought so.  I'm just
17  making sure.  And obviously the government already knows what
18  appeals are, so I don't have to give you any type of
19  admonishment.

20          Mr. Daoud, the Court wishes you good health, safety.
21  And through your safety and good health, the safety and good
22  health of all of us.  All right.  Thank you very much to
23  everyone.

24          MR. JONAS:  Thank you, Judge.

25          THE COURT:  All right.  Thank you.

1    DEFENDANT DAOUD:  Thank you.  I wish the same on you.

2    THE COURT:  Thank you.  All right.  Thank you mom and

3 dad.

4                    CERTIFICATE

5    I HEREBY CERTIFY that the foregoing is a true,

6 correct and complete transcript of the proceedings had at the

7 hearing of the aforementioned cause on the day and date hereof.

8

9 /s/TRACEY D. McCULLOUGH                    May 6, 2019

10 Official Court Reporter                    Date
   United States District Court
11 Northern District of Illinois
   Eastern Division
12

13

14

15

16

17

18

19

20

21

22

23

24

25